IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| JANNA AKERS and KIMBERLY MUNCY, ] | |
| ] | |
| Plaintiffs, ] | |
| ] | |
| v. ] | No. 2:12-CV- |
| ] | |
| EXPRESS SERVICES, INC. OF ] | |
| COLORADO or EXPRESS SERVICES, INC. ] | |
| a/k/a and d/b/a EXPRESS EMPLOYMENT ] | |
| PROFESSIONALS and BELMC, INC., ] | |
| ] | |
| Defendants. ] | |

**COMPLAINT**

Plaintiffs Janna Akers and Kimberly Muncy file their Title VII claims against the defendants for sex discrimination, sexual harassment, hostile work environment and retaliation against the defendant employment placement agencies and aver:

1. This Court is empowered to hear the plaintiff's federal sex discrimination, sexual harassment, hostile work environment, and retaliation claims pursuant to its federal question jurisdiction conferred at *29 U.S.C. §1331*. The plaintiff's employment discrimination and retaliation claims against each defendant are premised upon the provisions of Title VII of the

1964 Civil Rights Act codified at *42 U.S.C. §2000e-2, §2000e-3, §2000e-5,* and *42 U.S.C. §1981a*.

2. Plaintiff Janna Akers is a 47-year-old-white female. She resides in Carter County, Tennessee. At the times pertinent to her sex discrimination, hostile work environment, and retaliation claims, the plaintiff was employed as a staffing consultant at the defendants' Johnson City office.

3. Plaintiff Kimberly Muncy is a 37-year-old white female. She resides in Sullivan County, Tennessee. At the times pertinent to her sex discrimination, hostile work environment, retaliation, and constructive discharge claims, plaintiff Muncy was employed as a sales representative at the defendants' Johnson City office.

4. Express Employment Professionals, is a temporary/permanent staffing "employment agency" company which operates more than 600 offices in the United States, Canada and overseas. Express Employment Professionals, hereinafter referred to as "EEP," has been the nationally-known operating name of Express Services, Inc. That corporate name has been recently changed on the Tennessee Secretary of State's records to Express Services, Inc. of Colorado, which continues to do business as EEP. The defendant corporate entity's headquarters is located at 8516 NW Expressway, Oklahoma City, Oklahoma 73162-6010. All of the defendant's internet

2
Case 2:12-cv-00335-JRG-DHI   Document 1   Filed 08/14/12   Page 2 of 19   PageID #: 2

advertising lists that same Oklahoma City address as the address for EEP. The defendant company says it employs more than 300,000 individuals. The defendant maintains approximately 22 agency offices in Tennessee. EEP's corporate identity of Express Services, Inc. of Colorado (formerly Express Services, Inc.) lists its registered agent for service of process as C T Corporation System, Suite 2021, 800 Gay Street, Knoxville, TN 937929-9710. The plaintiffs aver that service of process on Express Services, Inc. of Colorado also constitutes service of process upon Express Services, Inc., and Express Employment Professionals.

5. EEP operates its employment agency staffing business in the Upper East Tennessee area through its Johnson City staffing office which is nominally operated by Belmc, Inc., a Tennessee corporation. Belmc's managing agents are Lester J. (Joe) Belcher and wife Terecia Belcher. Belmc's agent for service of process is listed as National registered Agents, Inc., Suite 305, 2300 Hillsboro Road, Nashville, TN 37212-4927. Temporary employees recruited and assigned by EEP and Belmc, Inc. and who were paid by EEP with the assistance of Belmc, Inc.'s staff are employees of both defendants for Title VII jurisdiction and liability purposes.

6. While EEP has claimed to the EEOC that its Johnson City office is an "independent contractor" franchisee owned by Belmc, Inc., EEP

actually operates its Johnson City staffing agency office as a "unified" employer with Belmc, Inc., or as a corporate Title VII "principal" with Belmc, Inc., as its Title VII "agent." Defendant EEP has established and maintains the operational policies and protocols for its Johnson City agency office and controls its financial operations. EEP is using BELMC, Inc. as its agent to carry out its business directives and business purposes in the Johnson City, Tennessee area. At all times pertinent to the plaintiffs' complaint, the two defendants were some "unified" or "single" employers for purposes of Title VII liability. Alternately, BELMC, Inc., performed and operated as the statutory agent for EEP pursuant to the "definitions" provisions of *42 U.S.C. §2000e(b)* so that Belmc's Title VII violations are legally the Title VII violations of EEP. 7. The plaintiffs aver that in the defendants' operating agreement and in practice, EEP sets and controls the terms of all temporary staffing contracts which its Johnson City office arranged with local business clients and sets the minimum bill rate at which all temp employees would be furnished to local business clients. All contracts procured through the EEP-Belmc Johnson City office have to be approved by corporate EEP. EEP requires all Johnson City area business clients to make their staffing contract payments directly to its corporate office. EEP retains its business clients' staffing payments in its own corporate bank accounts until it authorizes

the Johnson City/BELMC staff to print out its EEP corporate payroll checks for the temp employees which the Johnson City office had assigned to local business clients for the benefit of EEP. EEP requires BELMC, Inc. to use EEP's business name when dealing with the public, with clients, and when recruiting, assigning, and paying temporary employees. EEP determines the advertising which would be used for the Johnson City office and furnished all of the advertising literature which it used. All of the corporate advertising literature distributed by the defendants refers to "Express Employment Professionals."

8. Belmc, Inc. has had no separate individual business identity with regard to EEP's generating revenues by soliciting business clients and recruiting and placing individual temporary workers with those clients. The non-compete agreements which EEP required the plaintiffs to sign as a condition to their being employed at its Johnson City office were between the plaintiffs and Express Employment Professionals. The Johnson City's office employee handbook was the EEP corporate employee handbook. EEP established the job duties of the two plaintiffs at the Johnson City agency and determined the minimum number of Johnson City office staff which Belmc had to employ. EEP trained the plaintiffs in their job duties and agency operations and issued training certificates to them. EEP sets the office work hours for

its Johnson City office and for Belmc.

9. Defendant EEP maintains a Human Resources Department to assist its local staffing offices in dealing with staff and temporary employee complaints and concerns. EEP has grouped its various local offices into "areas" and maintains an operational chain of command to monitor and direct its local offices' operations. In their operating agreement, EEP requires Belmc to comply with all of its corporate operating rules, regulations, and policies. EEP also requires Belmc to comply with all federal and state employment laws. After EEP learns that Belmc is violating a federal or state employment law, it can notify Belmc to cease violating the law. If Belmc continues its illegal activities for more than 10 days after EEP's notice, EEP can terminate its business/agency relationship with Belmc. The plaintiffs aver that the sex discrimination, hostile work environment, and retaliation described hereinafter violated federal law codified in 42 U.S.C. §2000e-2 and §2000e-3 and should have been addressed by EEP as provided in its operating agreement with Belmc.

10. EEP administered and supervised the Johnson City office's book-keeping records. EEP determined and arranged for workers' compensation insurance, general liability insurance, errors and omissions insurance, and the fidelity bonding requirements for its Johnson City office operation.

EEP required Belmc to submit complete financial reports to its corporate managers by the 15th day of each month. EEP corporate management also reviewed the Johnson City office's weekly sales, weekly client contacts, new customers, and other details with the Johnson City office's managing agent Joe Belcher every week to make certain that Belmc and its Johnson City office complied with EEP's standards of profitability. Belcher openly expressed his anger and irritation after each weekly conference with the EEP area manager and complained repeatedly in front of the plaintiffs that EEP controlled the operations of the Johnson City office and repeatedly threatened to close it down if he could not meet the EEP profitability standards.

11. As described above, Belmc, Inc., and managing agents Joe Belcher and Terecia Belcher, were the Title VII agents of defendant EEP for purposes of Title VII liability. Alternately, Belmc, Inc., and EEP were a "unified" or "single" employer during the plaintiffs' respective tenures of employment at the defendants' Johnson City staffing office for purposes of Title VII liability.

12. Plaintiff Janna Akers began working as an employment counselor for EEP at its Johnson City office in May 2009. Within three months of her being hired, plaintiff Akers became the victim of an escalating pattern of sexual harassment and gender-based hostility. Belcher began

hugging the plaintiff from the front and rubbing her shoulders. Ms. Akers believed that Belcher would tire of touching her. She told Belcher that his rubbing her hurt and to please stop. Belcher began calling the plaintiff a "pussy" and a "bitch." Plaintiff Akers sometimes responded "that's ugly." He frequently "shot the bird" at her while she was interviewing a job applicant. Belcher routinely yelled at the plaintiff in a loud voice and frequently pointed at the office cleaning broom while he told Ms. Akers she could "ride the broom home." Belcher made offensive hand gestures simulating sex. Plaintiff Akers was offended and embarrassed by these continuing sexist, demeaning, and discriminatory comments and displays of sexually hostile harassment.

13. Plaintiff Kimberly Muncy began working for the defendants on August 13, 2009 as a sales agent. On the day Belcher told the plaintiff he was hiring her, he pulled Ms. Muncy tightly against his chest in a frontal hug. Thereafter, Belcher continued a pattern of unwelcome lewd and obnoxious behavior and made repeated threats of adverse employment actions which escalated into, and constituted, a continuing sexually hostile work environment. In September 2009, Belcher blew on the plaintiff's neck from behind while she was performing data entry activities at her desk. Ms. Muncy immediately jumped up and moved away. When the plaintiff asked Belcher what he was doing, Belcher laughed and said he was just seeing what she was

doing. Belcher repeatedly stared at both plaintiffs' breasts instead of looking the two ladies in the eyes when he talked to each of them.

14. Plaintiff Muncy complained of Belcher's sexual harassment to Celia Smith and Renay Larue, who operated the Express Employment Professionals office in Knoxville, Tennessee. The two ladies advised Ms. Muncy that Belcher's conduct was inappropriate, but that Belcher was an "owner" and that they could not do anything about the harassment. Celia Smith told plaintiff Muncy that she was personal friends with Joe and Terecia Belcher.

15. In September 2009, Belcher insisted that the plaintiffs ride with him to a Saturday EEP business seminar in Atlanta, Georgia. Belcher told the plaintiffs that they had to ride in the same car with him and stay in the same motel as he on Friday night and Saturday night. The plaintiffs objected to traveling with Belcher for the weekend trip. They offered to get up early on Saturday morning and drive together to Atlanta for the business seminar. Belcher told the plaintiffs: "that's not the way it works." He expressed extreme anger when the plaintiffs refused to make the weekend trip with him.

16. Manager Belcher routinely vented his anger with the plaintiffs by yelling at them, insisting that they do what he said to do, and slamming the office doors in their presence. The plaintiffs were intimidated, offended, and

9

disgusted by Belcher's unwelcome sexual harassment and sex-based hostility.

17. Belcher continued to sexually harass, offend, and embarrass both plaintiffs after Ms. Muncy had complained to his Knoxville office friends about him. Belcher began calling Ms. Muncy a "floozie" and told her she had to do what he said. Belcher began "shooting the bird" with his fingers at Ms. Muncy and making hand motions simulating sex. Plaintiff Muncy managed to avoid much of the daily sexual harassment since she left the office to make sales calls on area clients. Plaintiff Akers remained in the office with Belcher and was victimized each workday.

18. Belcher also sent lewd and sexually offensive e-mails to both plaintiffs. The e-mails included crude sexist jokes and photos of semi-nude women wearing Santa Claus hats. The plaintiffs verbally complained and objected to the unwelcome and offensive e-mails.

19. In February 2010, Belcher broached the subject of the plaintiffs' having to accompany him on a weekend business trip to Nashville in March 2010. Ms. Muncy insisted that she was family-oriented and would not go out of town for a weekend event. Belcher told Ms. Muncy that if she did not go with him to Nashville he would cut her pay. Ms. Muncy replied that she could not afford a pay cut.

20. Belcher continued his screaming at the plaintiffs, his insulting

name-calling, and his vulgar and offensive hand/finger signals. The plaintiffs observed Belcher's routinely watching pornography on his cubicle computer at the rear of the office. They sometimes observed Belcher's arm and hand moving when he was preoccupied with the pornography.

21. Throughout the plaintiffs' employment, Manager Belcher's sexual harassment and his obnoxious and offensive comments and retaliatory insults constantly distracted the plaintiffs from their office duties, embarrassed them, interfered with their employment activities and made it difficult for the plaintiff's to concentrate on business and perform their jobs. Belcher's sexual harassment and the hostile work environment which he created and maintained were objectively and subjectively offensive and hostile and made it difficult for the plaintiffs to perform their job duties.

22. In late February 2010, plaintiff Muncy complained to EEP's Knoxville office manager Renay Larue that Belcher had threatened to cut her pay if she did not accompany him on his planned Nashville trip. Ms. Muncy met with Ms. Larue in Johnson City on March 2, 2010, and told her she could not continue to work for Belcher. Ms. Larue offered Ms. Muncy a position at the EEP Knoxville office. The two agreed upon a March 15, 2010-start date. Larue told plaintiff Muncy not to notify Christy Patrick, EEP's Area Manager, about Belcher's sexual harassment, because corporate would not care

about her situation.

23. Despite Larue's warning that EEP corporate management would not help her, plaintiff Muncy telephoned EEP's Area Manager Christy Patrick and complained about Belcher's sexual harassment. She also described Belcher's threats to cut her pay and told Patrick of her intention to work for EEP's Knoxville office. Patrick replied that she did not have time to tell the plaintiff what to do and would have to call her back. Having had her report and complaints of sexual harassment rebuffed by EEP's area manager, plaintiff Muncy resigned on March 5, 2010 rather than continue to suffer Belcher's persistent sexual harassment and his threats to cut her pay if she did not accompany him on the weekend trip to Nashville. The plaintiff avers that her forced resignation constitutes a constructive discharge for purposes of the defendants' Title VII liability.

24. EEP's Area Manager Patrick subsequently telephoned plaintiff Muncy and advised her that she "did not want to handle the Belcher issues." Patrick told Ms. Muncy she had notified Vice-President of Human Resources Russ Mohen at Express Employment's corporate offices in Oklahoma City, Oklahoma about the plaintiff's complaints.

25. Plaintiff Muncy thereupon telephoned EEP's Human Resources V-P Russ Mohen by telephone and advised him about Belcher's sexual

harassment and hostile work environment. Mohen told Plaintiff Muncy that he was flying in to talk to Belcher and that he could he could terminate the company's franchise agreement with the Belchers and "shut him down." During several subsequent telephone conversations, the plaintiff asked Mohen if her reporting Belcher's sexual harassment would have any effect on her going to work at the EEP Knoxville office or at any other Express Employment branch. Mohen assured her it would not.

26. When plaintiff Muncy contacted Ms. Larue about starting work for the Knoxville office, Larue told her that Belcher had talked with EEP corporate and was trying to prevent her from working in the Knoxville EEP office because of the non-compete agreement. Larue told the plaintiff she would soon have her working in at the Knoxville office. However, Larue stopped returning the plaintiff's telephone calls and never arranged for her to work at the EEP Knoxville office. As alleged above, the non-compete agreement was between the plaintiff and EEP. Plaintiff Muncy avers that EEP's refusal to allow her to work at its Knoxville office was deliberate, malicious, discriminatory, and in retaliation for her complaining about and objecting to Belcher's sexual harassment.

27. After plaintiff Muncy left the defendants' Johnson City office, Joe and Terecia Belcher went though her office computer and called EEP

13

corporate to have her e-mails restored. The Belchers saw the e-mail communications which Mrs. Muncy had with the company's Vice-President of Human Resources. Belcher then sent out retaliatory and derogatory e-mails to competing employment agencies in the Upper East Tennessee area to discourage them from hiring plaintiff Muncy.

28. Plaintiff Muncy avers that defendant EEP's refusal to address her reports and complaints of sexual harassment at its Johnson City office, its refusal to stop its agent's sexual harassment, his threats of pay-cuts, and his hostile work environment, its refusal to allow her to subsequently work at its Knoxville office, and its allowing harasser Belcher to "black-ball" her from employment opportunities in the area were deliberate, malicious, and willful and constitute additional Title VII discrimination and retaliation. Plaintiff Muncy avers that the defendants are not entitled to assert any *Ellerth-Faragher* affirmative defense to the plaintiffs' Title VII claims.

29. Plaintiff Akers became the lone victim of Belcher's sexual harassment in EEP's Johnson City office. Ms. Akers contacted EEP's Human Resources Vice-President Russ Mohen and complained about Belcher's continuing sexual harassment, offensive lewd behavior, and hostile work environment. At Mohen's request, plaintiff Akers forwarded him Belcher's offensive e-mails and the names and phone numbers of the office staff. Mohen

gave Ms. Akers several telephone contact numbers.

30. In mid-July 2010, plaintiff Akers and vice-president Mohen discussed his flying-in to talk with the Belchers about the sexual harassment. Mohen then told Ms. Akers that he was too busy to come to Johnson City until December. Ms. Akers told Mohen that Belcher wanted her to accompany him to a Sales Summit meeting in North Carolina on September 17. The plaintiff told Mohen that she did not want to go but had no other option. Mohen said he "felt bad" for the plaintiff and could fly in on September 22, 2010. During a subsequent telephone conversation, Mohen told the plaintiff to consider staying employed at Express since she would be the only person who would know if Belcher's behavior "changed."

31. On Wednesday, August 11, 2010, Belcher telephoned plaintiff Akers around 4:00 p.m. and asked her if she wanted to "fool around." Stunned, the plaintiff asked Belcher to repeat himself. Belcher again asked the plaintiff if she wanted to "fool around" with him. When the plaintiff asked Belcher if he thought she were "an idiot" Belcher changed the subject.

32. On Thursday, September 2, 2010, Joe Belcher and Terecia Belcher told plaintiff Akers that they needed to make changes in the office, that she was an "awesome order-filler," but that they needed someone for "inside sales," and that this was her "last day." The plaintiff was the only

15

office employee at the time. The plaintiff avers that the reasons which the Belcher's announced for discharging her are pretextual. The plaintiff was discharged for refusing Belcher's sexual demands, for objecting to the sexually hostile work environment, and for reporting, complaining about, and objecting to the sexual harassment and hostile work environment to EEP corporate management.

33. When Terecia Belcher handed the plaintiff her pay check, the plaintiff asked if they were going to release her from the company's non-compete agreement. Joe Belcher yelled over his cubicle wall: "Most definitely not." The plaintiff called Russ Mohen before she departed the parking lot and left him a voice message about what had just happened. Several hours later, Mohen called the plaintiff back and said he was very sorry. Mohen added that he would keep in touch and would let the plaintiff know of the findings of the meeting he intended to have with Belchers.

34. EEP's HR Vice-President Mohen subsequently e-mailed plaintiff Akers on September 27, 2010. He advised her cryptically that he had met with the Belchers and had confidentially addressed her situation. Mohen did not contact the plaintiff again. EEP then retaliatorily and discriminatorily prevented the plaintiff from obtaining employment with its Knoxville and Morristown agencies. Plaintiff Akers avers that EEP's refusal to stop

16

Belcher's sexual harassment and hostile work environment, its refusal to prevent the Belchers from discharging her, and its preventing her from working at its Knoxville office were deliberate, malicious, and willful, and constitute additional gender discrimination and Title VII retaliation.

35. Both plaintiffs were sexually harassed, discriminated against, and retaliated against because they are women who complained about their manager's sexual harassment and hostile work environment. EEP's local managing agent Joe Belcher created and maintained a continuing sexually hostile work environment. EEP corporate managers illegally permitted the hostile work environment to continue although each plaintiff had objected to it and had notified EEP corporate officials about it. EEP's corporate vice-president Russ Mohen heard the plaintiffs' complaints and objections, promised to address them, and never did. Express Employment Professionals adopted, condoned, and ratified the sexually hostile and retaliatorily hostile work environment and all of Belcher's employment-related threats and actions.

36. As a result of the defendants' sexual harassment and hostile work environment, each plaintiff suffered emotional distress and anxiety. As a result of the defendants' discriminatory and retaliatory discharge and constructive discharge, plaintiff Akers and plaintiff Muncy suffered additional emotional stress. Each plaintiff individually lost wages and will lose wages

in the future. The earning capacity of each plaintiff has been impaired. Plaintiff Muncy and plaintiff Akers have each had their enjoyment of life diminished.

37. The defendants' sexual harassment, discrimination, retaliation, hostile work environment, and retaliatory and constructive discharges described above were deliberate, willful, malicious and in reckless disregard of each plaintiff's federally protected rights. Each plaintiff is entitled to her respective awards of compensatory damages and punitive damages from the defendants pursuant to the provisions of Title VII of the 1964 Civil Rights Act and *42 U.S.C. §1981a*.

38. Plaintiff Akers and plaintiff Muncy each filed charges of sex discrimination, sexual harassment, hostile work environment, and retaliation with the EEOC, have received their respective right-to-sue letters, and have exhausted their administrative remedies.

WHEREFORE, THE PLAINTIFFS DEMAND:

1. Judgment against the defendants for all compensatory damages to which each is entitled under Title VII and *42 U.S.C. §1981a*.

2. Judgment against the defendants for all punitive damages to which each plaintiff is entitled under Title VII and *42 U.S.C. §1981a*.

3. Individual awards of lost wages.

4. Individual awards of front pay.

5. A jury to try each of the plaintiff's claims.

6. Individual awards of attorney's fees as the prevailing party.

7. Other relief to which each plaintiff may be entitled.

                s/ C. R. DeVault, Jr.
                CHARLTON R. DEVAULT, JR.
                TN BPR #000428
                102 Broad Street
                Kingsport, Tennessee
                (423) 246-3601

                ATTORNEY FOR PLAINTIFFS
                JANNA AKERS and
                KIMBERLY MUNCY

19
Case 2:12-cv-00335-JRG-DHI   Document 1   Filed 08/14/12   Page 19 of 19   PageID #: 19